IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| TIMOTHY COREY, | ) | |
| | ) | CIVIL ACTION NO. 0:05-1559-HMH-BM |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SOUTH CAROLINA DEPARTMENT OF | ) | |
| CORRECTIONS, DORIS CURENTON, | ) | **REPORT AND RECOMMENDATION** |
| ALVIN GRABER, JOHN HOUSER, | ) | |
| TONYA JEWELLS,  BERNARD | ) | |
| MCKIE, JON OZMINT, JOAN PECK, | ) | |
| ESTHER QUATTLEBAUM, | ) | |
| TIMOTHY RILEY, JUDITH ROSE, | ) | |
| JIMMY SIMMONS, ROBERT | ) | |
| STEVENSON, III, J.W. THOMAS, | ) | |
| REID WHITE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This action has been filed by the Plaintiff, pro se, pursuant to 42 U.S.C. § 1983, and

the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc-1.

Plaintiff, an inmate with the South Carolina Department of Corrections, alleges violations of his

constitutional rights, as well as a violation of the RLUIPA.

The Defendants filed a motion for summary judgment pursuant to Rule 56,

Fed.R.Civ.P., on July 28, 2006.  As the Plaintiff is proceeding pro se, a Roseboro order was entered

by the Court on August 2, 2006, advising Plaintiff of the importance of a motion for summary

judgment and of the need for him to file an adequate response. Plaintiff was specifically advised that

if he failed to respond adequately, the Defendants' motion may be granted, thereby ending his case.

After receiving an extension of time to respond, Plaintiff filed a memorandum in opposition to the



Defendants' motion, with attached exhibits, on October 27, 2006. Defendants' motion is now before the Court for disposition.[1]

## **Background and Evidence**

Plaintiff alleges in his verified amended Complaint[2] that starting in October of 2004 the Defendants Rose and Curenton would return religious books sent to the Plaintiff back to the publisher. Plaintiff alleges that Curenton told him to talk to the "Chaplain" about this matter, but that when he spoke with the Defendant Chaplain John Houser on December 2, 2004, he stated that he had never seen the material and had not authorized the return of any materials. Plaintiff alleges that he wrote to the Defendant Reid White, Head Chaplain, about these books being returned, but that White never responded. Plaintiff also alleges that it took Houser four (4) years to get him a Catholic Bible, even though "Religious Policy PS-10-05" states that a Roman Catholic is allowed a Bible and other religious books.

Plaintiff also complains that he wrote to Chaplain Houser in February 2005 asking him to inform kitchen personnel that he did not eat meat during Lent. Plaintiff alleges that Houser informed him that he advised food service to "prepare [his] trays per Policy PS 10.05 Inmate Religious Policy pg. #39 paragraph 2.2.7" but that the Defendant Thomas "of food service" did not comply. Plaintiff alleges that he then wrote the Defendant "Head Food Service Director Tonya

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C. The Defendants have filed a motion for summary judgment. As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.

[2]In this Circuit, verified complaints by pro se prisoners are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). Plaintiff has filed a verified Complaint. Therefore, the undersigned has considered the factual allegations set forth in the verified Complaint in issuing a recommendation in this case.

2



Jewel", and that she responded on March 18, 2005 that the Department serves Tuna fish on Ash Wednesday and each Friday through Good Friday, and that if Plaintiff was otherwise not eating meat he should "pick it out or eat around it". Plaintiff alleges that this is discriminatory because the Department does not tell vegetarians to eat around meat, nor does it tell Muslims to pick around pork.

Plaintiff also alleges that he was denied rosary beads, which Plaintiff does not believe are a security threat, while Muslims are allowed to see "Muslim videos every weekend from Friday to Sunday night." Plaintiff alleges he needs rosary beads for proper prayer. Plaintiff asserts that all of these actions are a violation of the RLUIPA.

Plaintiff also asserts a constitutional claim of denial of access to the courts, apparently based at least in part on "law librarians [not answering] any questions because the law librarian is not an attorney" and because "it's against DOC policy for inmates to assist each other...." Plaintiff also complains that the Department of Corrections does not have updated law books (apparently referring to "local" law books), with Plaintiff alleging that "policy GA.01.03" states that "there will no longer be any more updated law books." Plaintiff further alleges that he mailed three legal letters "to advocacy companies for assistance outside the State of South Carolina" in January 2005, but that "all three (3) of these letters were took from the mailroom by the commissary lady [Defendant] Joan Peck." Plaintiff alleges that he was informed of these actions by the Defendant Judith Rose, who wrote on Plaintiff's E.H. Cooper withdrawal slip that they had been taken by Peck. Plaintiff alleges that, to this day, no one knows where these three letters are. Plaintiff alleges he wrote to the Defendant Warden Bernard McKie on January 28, 2005 concerning this matter, and that he was advised by McKie that "these letters were determined to be legal and [were] mailed the next day." Plaintiff alleges, however, that his E.H. Cooper account fails to reflect that these letters were ever



mailed.

Plaintiff also alleges that on March 2, 2005 he sent two legal affidavits (from Roy Lindsey and John New) to be copied. Plaintiff alleges that these affidavits dealt with Deputy Warden Stevens dealing in contraband, and that the Defendant Esther Quattlebaum called the Defendant Robert Stevenson and informed him of the contents of these affidavits, at which time Stevenson told her to "take them to contraband." Plaintiff alleges he complained to both Stevenson and McKie about his affidavits being taken, but that he received no response from McKie, while he was told by Stevenson that they were "being returned to [Plaintiff] by orders of...general counsel." Plaintiff alleges that, if Quattlebaum was qualified to do her job, she would have known that an affidavit is "legal" and that she should not have violated Plaintiff's "confidentiality".

Plaintiff alleges that on March 18, 2005 he complained to McKie again about the way documents in a yellow legal folder marked "legal copies Tim Corery" were handled, and that McKie responded by telling him there had been a misunderstanding in reference to the way those documents were sent. Plaintiff alleges that Quattlebaum told him on March 22, 2005 that "she gave these said affidavits to Corporal Dykes to give to Captain Lane to copy and return to [Plaintiff]." Plaintiff alleges, however, that these officers deny ever having received anything from Quattlebaum. Plaintiff alleges that when McKie told him that he [McKie] had been informed by Quattlebaum that Captain Lane had returned the two affidavits to the Plaintiff on March 28, 2005, he wrote Captain Lane and that Lane responded on March 28, 2005 that he had made no copies for the Plaintiff and had not returned any documents to him. Plaintiff further alleges that both Lindsey and New refused to re-write their affidavits "due to the retaliation of Mr. McKie and Deputy Warden Stevenson."

Plaintiff also alleges that on February 14, 2005, the Defendant Rose "refused to take



my legal mail after I had to staple the paperwork, tape it and seal it up and mail it to the Supreme Court." Plaintiff alleges Rose again refused to wait on legal mail he was stapling on February 18, 2005, stating that she did not have to wait for these procedures to be done, even though Rose knows that he was not allowed to have staples in his cell. Plaintiff alleges that he complained to Jon Ozmint, Director of the Department of Corrections, about this incident but never received any response.

Plaintiff also alleges that on April 25, 2005 a legal book mailed to him from a publishing company was refused and returned. Plaintiff alleges that this mail had been opened in the mailroom out of his presence, refused, and mailed back to the sender at Plaintiff's cost. Plaintiff alleges that he wrote to the Defendant Associate Warden Riley to ask why his mail had been opened and refused, and that Riley responded by quoting a policy "that has nothing to do with law books or legal mail."

Finally, Plaintiff complains that his grievances are not being properly responded to. Plaintiff alleges that he has written to the Defendant Jimmy Simmons on numerous occasions complaining about his grievances either not getting filed or not being responded to, but that he still has grievances that have not been responded to. Plaintiff then goes on to list several grievances he alleges he has filed, but which were either mishandled, not properly responded to, or not responded to at all. Plaintiff alleges that the way the Defendants have handled his grievances violate the Department's own grievance policies.

Plaintiff requests various injunctive relief, as well as monetary damages. As exhibits to Plaintiff's original Complaint (filed prior to the amended Complaint currently before the Court), Plaintiff has submitted copies of several documents relating to his grievances and alleged non-



responses to these grievances, as well as a copy of a letter to Director Ozmint concerning his complaints. <u>See</u> <u>generally</u>, <u>Amended Complaint and Exhibits to Original Complaint</u>.

In support of summary judgment in the case, the Defendants have submitted several articles concerning the Catholic faith. An article entitled "*Lent: Call to Conversion*" is a printout from *American Catholic.org*. A second article is a treatise on Lent from an internet encyclopedia, while a third article is a treatise on the Rosary from the same internet encyclopedia.

The Defendant John Thomas has submitted an affidavit wherein he attests that he is the Food Service Coordinator at the Kirkland Correctional Institution (KCI), where Plaintiff was housed during the relevant time period, and that as Food Service Coordinator he is responsible for overseeing the preparation and distribution of food to inmates. Thomas attests that the menu served each day at KCI is in accordance with SCDC policy requirements, that during the Catholic period of Lent SCDC policy provides for Tuna fish to be served on Ash Wednesday and each Friday during that period, and that these requirements are followed. Thomas attests that, to his knowledge, the remaining meals during the Lent period are nutritionally adequate even if the meat entree is omitted by the inmate. <u>See</u> <u>generally</u>, <u>Thomas Affidavit</u>.

The Defendant Bernard McKie has submitted an affidavit wherein he attests that he is the Warden at KCI (also called the Kirkland Reception and Evaluation Center), and that Plaintiff was housed in the Maximum Security Unit (MSU) at KCI during the relevant time period. McKie attests that the MSU is a specialized housing unit for inmates who have demonstrated an unwillingness to conform to the rules and regulations of a special management unit, who have been charged with violent criminal behavior committed while in the general population, and/or for whom emergency placement has been ordered by the Agency Director or the Deputy Director of Operations.



The MSU typically houses some of the worst inmates in the Department of Corrections, and as a general rule no inmate is placed in the MSU based on conduct outside the Department of Corrections. Rather, placement in the MSU is based exclusively on conduct by an inmate while incarcerated. McKie attests that the operation of the MSU is governed by SCDC Policy No. OP-22.11, a true and accurate copy of which is attached to his affidavit as Exhibit A.

McKie attests that Plaintiff has a long criminal history, and has been in and out of the custody of the Department of Corrections for the majority of his adult life. Plaintiff's convictions include a conviction for escape, and for threatening the life of a public official. While incarcerated, Plaintiff also pled guilty to the murder of another inmate. See McKie Affidavit, Exhibit B. McKie attests that Plaintiff was transferred to the MSU on June 9, 2000 due to his extensive history of disciplinary convictions and his history of violent conduct. See McKie Affidavit, Exhibit C [MSU Review of Timothy Corey]. McKie attests that Plaintiff was later determined by the MSU Review Committee to have made a positive adjustment and was released from the MSU on June 15, 2005. He is currently held at the Perry Correctional Institution (PCI).

McKie attests that the behavior of MSU inmates is managed in part by using a level system which encourages and rewards appropriate behavior. The level system uses privileges as a means to encourage good behavior and punish poor behavior, with Level III inmates having the most privileges and Level I the fewest privileges. McKie attests that the Department of Corrections has very limited means to encourage and promote discipline in the MSU given the nature of the unit and the restricted privileges already available, and that by imposing incremental disadvantages, such as by limiting books and periodicals for bad behavior, the correctional goal is to modify the behavior that has led to the inmate's assignment to the MSU. McKie attests that, among the privileges used

7



as part of this level system, are the restrictions on books and periodicals of which the Plaintiff is complaining in this lawsuit. McKie attests that limitations on books and periodicals serve to promote better behavior and discipline, which is an important and necessary reason for this policy.

McKie further attests that, pursuant to ¶ 13.1 of Policy OP-22.11, Plaintiff was able to continue to receive any periodical subscriptions paid for prior to his admission to the Unit until the subscription expired, but that he was not allowed to renew any subscription while in the MSU. Depending on his level, Plaintiff was also allowed one, two or three books or periodicals at a time, with many books and periodicals being available to MSU inmates from the KCI library. McKie attests that these books and periodicals are made available from a book cart in the MSU, that they may be interchanged at least weekly, and that efforts are made to change or update books and periodicals on the book cart. In addition to these books or periodicals, McKie attests that Plaintiff was also allowed to possess a primary religious book such as a Bible or a Koran, and was further allowed access to legal books and materials, with legal materials being available upon request on Monday, Wednesday and Friday. McKie attests that while in the MSU, Plaintiff asked for his religious preference to be changed to Catholicism, at which time Chaplain Houser provided Plaintiff with a paperback Catholic Bible to possess in his cell.

McKie attests that the restrictive environment in the MSU serves as a deterrent for inmates to adjust their behavior and conduct to avoid placement in the MSU, while the restrictive environment also serves as an incentive to MSU inmates to adjust their behavior to gain additional privileges and eventual release from the Unit. McKie notes that it is necessary for inmates in the MSU to have limited places to hide weapons and contraband in order to provide a more secure and safe environment for other inmates and staff, which is another reason for the limitations on books and



publications.  McKie attests that books and publications also represent a fire hazard in the MSU, and that fires that have occurred in the MSU in the past have presented a difficult challenge for the Department to prevent injury to inmates and staff and damage to the Institution.

With respect to Plaintiff's complaints about being denied rosary beads, McKie attests that access to items such as rosary beads is controlled by SCDC Policy PS-10.05 ["Inmate Religion"]. A copy of this policy is attached to McKie's affidavit as Exhibit D.  McKie attests that ¶ 10.4 of this policy provides that the Warden "may prohibit possession by an inmate of any item [he] deems may pose a security or safety threat to the facility, staff, or others", while ¶ 11.7 provides that "[a]ny specific item can be denied if the size or construction is a risk to the safety and security of any person".  McKie attests that, given Plaintiff's history of disciplinary problems and violent behavior, including the strangulation of another inmate, he made the decision that possession of hard string beads by the Plaintiff would constitute an unjustifiable security and safety concern for staff and inmates at the Institution.  McKie further attests that rosary beads themselves could easily be sharpened and used as a projectile weapon, and that given Plaintiff's history during his incarceration for manufacturing weapons, the position of rosary beads by the Plaintiff was deemed to constitute an unjustifiable security and safety concern. See generally, McKie Affidavit, with attached Exhibits.

The Defendant John Houser has provided an affidavit wherein he attests that he is the Senior Chaplain at KCI and is familiar with the allegations made by the Plaintiff in his Complaint. Houser attests that he has had several personal dealings with the Plaintiff, usually regarding some complaint or request for religious items/materials, and that he worked with the Plaintiff and eventually got his religious preference changed in the SCDC date base from "no religious preference" to Catholicism in December 2004.  Houser attests, however, that Plaintiff has never provided any



proof of confirmation into the Catholic Church.

Houser attests that he worked with the Plaintiff to provide him with a Catholic Bible, and that when he became aware that Plaintiff was requesting a Catholic Bible, he personally provided him with a paperback Catholic Bible on December 8, 2004. With respect to Plaintiff's request for rosary beads, Houser attests that he forwarded Plaintiff's request to Warden McKie and Captain Gary Lane (of the MSU) and asked for their approval for the Plaintiff to possess rosary beads in the MSU, but that McKie denied Plaintiff's request for security reasons. Houser attests that rosary beads are not an essential part of the Catholic faith, with the physical beads being really just an aide in making the rosary prayers, and that a Catholic can adequately practice their faith without using rosary beads.

Finally, with respect to Plaintiff's allegations concerning the menu he was served in the MSU during the Lenten period, Houser attests that this period lasts from Ash Wednesday until Easter Sunday, with Catholics being required to eat fish on Ash Wednesday and every Friday during Lent. Houser attests that, in response to Plaintiff's request/concern regarding the Lent menu, he spoke with the Defendant Thomas to ensure that the menu served on Lent was in accordance with Catholic practices, and that he [Houser] found that the menu served during Lent as it related to the practices of Catholics was appropriate. Houser attests that, to his knowledge, Plaintiff was able to practice his religion, Catholicism, while he was confined in the MSU, and that none of the allegations made in Plaintiff's Complaint prevented him from practicing Catholicism. See generally, Houser Affidavit.

As attachments to his response to the Defendants' motion for summary judgment, Plaintiff has submitted a copy of a request to staff dated October 16, 2006 asking for several legal publications and/or SCDC policies, and showing that he got a response that one of the law books he



requested (313 F.Supp.2d 569) was not available. Another copy of a request to staff form is attached, which apparently was self-made by the Plaintiff, as is another regular request to staff member form dated October 23, 2006, requesting several legal publications, but bearing no response. In his response to the Defendants' motion for summary judgment, filed just a few days later, Plaintiff complains about his inability to obtain copies of certain documents and/or publications.

## Discussion

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P. Further, while the Federal Court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, see Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. Weller v. Dep't of Social Services, 901 F.2d 387 (4th Cir. 1990).

## I.

### (Religious Rights Claim Under the RLUIPA)

Plaintiff's claim that his religious rights are being violated is brought under the RLUIPA, which provides that no government shall impose a substantial burden on the religious



exercise of a person residing in or confined to an institution unless the government demonstrates that imposition of the burden on that person 1) is in furtherance of a compelling governmental interest, and 2) is the least restrictive means of furthering that compelling governmental interest. See 2 U.S.C. § 2000cc-1(a); Cutter v. Wilkinson, 544 U.S. 709, 712 (2005).

        In arguing for summary judgment on this claim, Defendants first note that the RLUIPA only applies to a program or activity that receives federal financial assistance or that affects interstate or foreign commerce. 42 U.S.C. § 2000cc-1(b); Ephraim v. Angelone, 313 F.Supp.2d 569, 575 (E.D.Va. 2003), aff'd 2003 WL 21480621 (4th Cir. 2003). Defendants further note that it is the Plaintiff who has the burden of pleading and proving the applicability of the RLUIPA to a challenged program or activity, and argue that Plaintiff has presented no evidence whatsoever to meet this burden. However, while Plaintiff's claims concerning the service of meat during Lent and the denial to him of rosary beads may not meet the interstate commerce requirement, it is arguable that the Defendants' policy of returning books and other publications and mail to the publisher is an activity affecting interstate commerce. Further, even though the undersigned agrees with the Defendants that Plaintiff has presented no evidence to show that the Department of Corrections in general, or any of the specific policies cited by the Plaintiff in his Complaint, receive federal financial assistance, the Supreme Court in Cutter appears to have opined in a footnote that the federal financial assistance requirement is met with respect to inmates housed in state prison systems. Cutter, 544 U.S. at 715-716, n. 4 ["Every State...accepts federal funding for its prisons"]. Therefore, for purposes of summary judgment, the undersigned has proceeded to a discussion of Plaintiff's religious claims on the merits.

        Nevertheless, even if this Statute does apply in this case, Plaintiff has failed to present



sufficient evidence to create a genuine issue of fact as to whether any violation of that Statute has occurred.  As reflected in the evidence, during the time period at issue Plaintiff was an inmate in the Maximum Security Unit of his prison, where the most violent and disruptive inmates in the prison system are kept, and where security concerns are paramount.  It is well settled that the placement of inmates into such units is a valid means of minimizing a "threat to security of the Institution, safety of other residents and/or staff, etc.".    Jackson v. Bostick, 760 F.Supp. 524, 528 (D.Md. 1991). Prison officials are necessarily given wide ranging deference with respect to custody conditions for such inmates, and in such an environment, restraints on an inmate's liberties and freedoms should be expected.  Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995) [Prison officials have legitimate penological interests in Administrative Segregation, and they must be given "wide-ranging deference" with respect to their need to maintain order, discipline, and "institutional security"], reh'd denied, 75 F.3d 448 (9th Cir. 1995), cert. denied, County of Kern v. Anderson, 116 S.Ct. 306 (1995); Cutter, 544 U.S. at 709 ["Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions and anticipated that courts would apply the Act's standard with due deference to prison administrator's experience and expertise."]; Murphy v. Mo. Dep't of Corrections, 372 F.3d 979, 987 (8th Cir. 2004) [Same deference given to the expertise of prison officials under Religious Freedom Restoration Act ("RFRA") applies to  RLUIPA];   cf. Daigre v. Maggio, 719 F.2d 1310, 1313 (5th Cir. 1983) ["[S]olitary confinement is a disciplinary measure whose very essence is the deprivation of interests the first amendment protects....To promote the important government interest in maintaining discipline, officials must have available sanctions that impose incremental disadvantages on those already imprisoned"].

       Based on the evidence before the Court, the undersigned does not find that the policies



at issue (the service of meat during Lent, the denial of rosary beads, and the returning to the publisher of religious books that had been ordered) impose a substantial burden on the exercise of Plaintiff's religious rights.  Under the dietary policy cited by both the Plaintiff and the Defendants, as well as is described in the articles submitted by the Defendants, Plaintiff is able to observe the diet required for Lent, if he chooses to do so.  Abernathy v. Cunningham, 393 F.2d 775, 778 (4th Cir. 1968) [officials need not provide a special religious diet if the inmate can maintain an adequate diet by choosing items from the available menu that do not offend his sincere beliefs].  Further, while rosary beads are an accessory for Catholic prayer, as indicated in the affidavit of Chaplain Houser, they are not a *requirement* for worship. Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 450-451 (1988) [A government regulation does not substantially burden religious activity when it only has an incidental effect that makes it more difficult to practice the religion]. Finally, the evidence shows that Plaintiff has also been provided with a Catholic Bible (even though Plaintiff complains about a delay in receiving his Bible), and the Department of Corrections' restrictions on the receipt of new publications by inmates in the MSU, while obviously an inconvenience, likewise does not impose a "substantial burden" on the Plaintiff's exercise of his religious beliefs. Nicholas v. Ozmint, No. 04-22471, 2006 WL 895017 (D.S.C. Mar. 31, 2006) [No substantial burden found where, although plaintiff was not allowed unlimited number of religious texts, plaintiff could possess the central book of his faith], aff'd, 2006 WL 3057360 (4th Cir. Oct. 26, 2006);  *cf.* Greene v. Solano County Jail, No. 04-0917, 2006 WL 2067056, *9 (E.D.Cal. July 24, 2006) ["While the jail policy with respect to group religious services for maximum security detainees may have made it more difficult or inconvenient for plaintiff to practice his religion, such action did not substantially burden his religious activity."], report and recommendation adopted by, 2006 WL 2671075 (E.D.Cal. Sept.



18, 2006).

    In any event, the evidence before the Court also shows that the policies at issue are in furtherance of a compelling governmental interest; i.e., the safety of prison staff as well as of the inmates themselves, and Plaintiff has failed to demonstrate, or provide evidence to show, any less restrictive means of furthering this compelling governmental interest. The need to restrict potentially dangerous items and artifacts like a string of beads from inmates such as the Plaintiff is manifest, while substantial caselaw exists for the proposition that restrictions on property, including publications, by inmates in maximum security further a compelling governmental interest. Higgins v. Burroughs, No. 85-33884, 1988 WL 33884, * 7-8 (E.D.Pa. Mar. 31, 1988) [rosary beads could be used as a weapon and a threat to prison security]; Cutter, 544 U.S. at 709 ["Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions and anticipated that courts would apply the Act's standard with due deference to prison administrator's experience and expertise."];   Hoevenaar v. Lazaroff, 422 F.3d 366, 367 (6th Cir. 2005) ["RLUIPA is similar to the Religious Freedom Restoration Act of 1993 (RFRA) in that the court must determine whether the plaintiff is likely to succeed in demonstrating that the regulation in issue imposes a substantial burden on his religious exercise. Assuming the Plaintiff makes this initial showing, the court next considers whether the regulations meet strict scrutiny, i.e., the regulation must be 'the least restrictive means' towards furthering 'a compelling government interest.' [citations omitted] Again, this test is the same as that previously imposed under RFRA."]; Daigre, 719 F.2d at 1313 ["To promote the important government interest in maintaining discipline, officials must have available sanctions that impose incremental disadvantages on those already in prison. Left free to write to anyone in the world and to receive literature of any kind, a prisoner



might find punitive isolation desirable, offering solitude and leisure as an alternative to the ordinary conditions of prison work and life. Thus, a narrower restriction on first amendment interests would likely prove ineffective in maintaining discipline"]; <u>Gregory v. Auger</u>, 768 F.2d 287, 290 (8th Cir. 1985) [restrictions on certain types of correspondence, including junk mail, newspapers and magazines serve a legitimate penalogical objective of "deterrence of future infractions of prison rules"]; <u>see also</u> <u>Ramirez v. McCaughtry</u>, No. 04-335, 2005 WL 2010173 (W.D.Wisc. 2005) [upholding policy that restricted access to newspapers, magazines, and photographs to inmates in segregation as part of an incentive system for good behavior]; <u>Warsoldier v. Woodford</u>, 418 F.3d 989, 997 (9th Cir. 2005) (quoting <u>Harris v. Chapman</u>, 97 F.3d 499, 503-504 (11th Cir. 1996)) [finding state's "compelling interest in security and order within their prisons" especially applies "in 'close custody' facilities like MCI which contain extremely violent offenders"]; <u>Hamilton v. Schriro</u>, 74 F.3d 1545, 1555 (8th Cir. 1996).

Therefore, Plaintiff's claims under RLUIPA are without merit, and should be dismissed.

## II.

### (Denial of Access to the Courts Claim)

Plaintiff's claim for denial of access to the Courts has several components, one of which involves his complaint about the prison returning a legal book that he had ordered. However, as previously noted, the Defendants' evidence reflects the motivations and rationale behind this policy, which has been specifically upheld by the courts of this District and Circuit. <u>See</u> <u>Corey v. Reich</u>, No. 02-2801, 2004 WL 3090234, <u>aff'd</u>, 2004 WL 1730327 (4th Cir. 2004), <u>cert. denied</u>, 544 U.S. 924 (2005); <u>Incumaa v. Ozmint</u>, C/A No. 0:03-2776-22BD; <u>Strong v. Ozmint</u>, C/A No. 2:03-

16



2256-24AJ, 106 Fed.Appx. 836 (4th Cir. Aug. 11, 2004); <u>see</u> <u>also</u> <u>Daigre</u>, 719 F.2d at 1313 ["To promote the important government interest in maintaining discipline, officials must have available sanctions that impose incremental disadvantages on those already in prison. Left free to write to anyone in the world and to receive literature of any kind, a prisoner might find punitive isolation desirable, offering solitude and leisure as an alternative to the ordinary conditions of prison work and life. Thus, a narrower restriction on first amendment interests would likely prove ineffective in maintaining discipline"]; <u>Gregory</u>, 768 F.2d at 290 [restrictions on certain types of correspondence, including junk mail, newspapers and magazines serve a legitimate penalogical objective of "deterrence of future infractions of prison rules"]. These types of policies serve as a valid incentive for Plaintiff to modify his behavior to obtain release back to a less restrictive facility, where he would be allowed to receive publications from outside sources. <u>Ramirez</u>, No. 04-335, 2005 WL 2010173 [upholding policy that restricted access to newspapers, magazines, and photographs to inmates in segregation as part of an incentive system for good behavior]; <u>see</u> <u>In re Long Term Administrative Segregation of Inmates Designated as Five Percenters</u>, 174 F.3d 464, 469 (4th Cir. 1999) ["Prison officials 'should be accorded wide-ranging deference in adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security'"] (quoting <u>Bell v. Wolfish</u>, 441 U.S. 520, 547 (1979)); <u>Overton v. Bazzetta</u>, 539 U.S. 126, 132 (2003) ["We must accord substantial deference to the professional judgment of prison administrators, who bear significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them"].

   With respect to Plaintiff's claims concerning the alleged taking or loss of three legal letters and/or refusal to collect his legal mail, interference with an inmate's mail can state a



17

cognizable claim under § 1983.  See Witherow v. Paff, 52 F.3d 264, 265 (7th Cir. 1995) [prisoners

enjoy a First Amendment right to send and receive mail]; Miniken v. Walter, 978 F.Supp. 1356

(E.D.Wa. 1997).  Further, actions taken by prison officials which amount to denial of an inmate's

access to the courts are also actionable under § 1983. See Bounds v. Smith, 430 U.S. 817 (1977).

However, with respect to the three letters Plaintiff alleges he mailed to legal aid societies/advocacy

companies, and that Plaintiff alleges were improperly removed from the mail bag by the Defendant

Peck (assumed to be true for purposes of summary judgment), Plaintiff himself states in his

Complaint that he was advised that, after it was determined these mailings were in fact legal mail,

they were mailed the next day. Plaintiff claims in his Complaint that they were not mailed, but has

provided no evidence to support this general and conclusory claim.  Morgan v. Church's Fried

Chicken, 829 F.2d 10, 12 (6th Cir. 1987) ["even though pro se litigants are held to less stringent

pleading standards than attorneys, the Court is not required to 'accept as true legal conclusions or

unwarranted factual inferences'"]. Plaintiff's complaint about a legal package not being mailed in

February 2005 because the mail worker became impatient and refused to wait for the Plaintiff to

finish stapling his legal materials also fails to state a claim, as Plaintiff fails to explain why he could

not have, after he finished stapling these materials, simply mail that package the following day.

        In any event, with respect to both of these claims, Plaintiff has failed to submit

sufficient evidence to establish a constitutional claim.  In order to state a claim for denial of access

to the courts, Plaintiff must allege both a denial of court access *and* some prejudice resulting from

the denial of access.  Strickler v. Waters, 989 F.2d 1375, 1382-1383 (4th Cir. 193), cert. denied, 510

U.S. 949 (1993); Magee v. Waters, 810 F.2d 451, 452 (4th Cir. 1987); Shango v. Jurich, 965 F.2d

289, 293 (7th Cir. 1992).    Plaintiff has failed to present any evidence, or even to make any



allegations, to show that the mailroom attendant's refusal to wait on him to finish stapling some legal papers, or the three letters mailed to legal advocacy groups not being delivered (assumed this allegation to be true), denied him access to the courts, nor has he shown any prejudice as required by the applicable caselaw. See <u>Magee</u>, 810 F.2d at 452 [Courts have required a showing by a complaining prisoner of actual injury or specific harm to him before a claim of lack of access to the courts will be sustained"]. Therefore, these claims are also without merit.

As for Plaintiff's claims concerning the lost or confiscated affidavits, it is readily apparent from a review of the allegations of Plaintiff's complaint that these affidavits dealt with a complaint Plaintiff was purportedly making or attempting to make that someone on the prison staff was receiving contraband in exchange for a pair of shoes and sexual magazines. This allegation has nothing to do with denying Plaintiff access to the courts, and therefore fails to set forth a claim for denial of access to the courts under <u>Bounds</u>.

### III.

Finally, to the extent Plaintiff is complaining about the operation of the prison grievance system and that his grievances are not being timely responded to or are otherwise being mishandled, this is not a claim cognizable under § 1983 as there is no constitutional right to access to a prison grievance procedure. See <u>Adams v. Rice</u>, 40 F.3d 72 (4th Cir. 1994); <u>Flick v. Alba</u>, 932 F.2d 728, 729 (8th Cir. 1991); <u>Buckley v. Barlow</u>, 997 F.2d 494, 495 (8th Cir. 1993) [existence of a prison grievance procedure does not confer any substantive right upon inmates]; <u>Brown v. Dodson</u>, 863 F.Supp. 284 (W.D.Va. 1994) [inmates do not have a constitutionally protected right to a grievance procedure]; <u>Azeez v. DeRobertis</u>, 568 F.Supp. 8, 10 (N.D.Ill. 1982) [even where a state elects to provide a grievance mechanism, violations of its procedures do not deprive prisoners of



federal constitutional rights. Therefore, a state's failure to follow its grievance procedures does not give rise to a § 1983 claim]; Spencer v. Moore, 638 F.Supp. 315, 316 (E.D.Mo. 1986) [holding that an inmate grievance procedure is not constitutionally required]; see also McGuire v. Forr, 1996 WL 131130, at *1 (E.D.Pa. March 21, 1996), aff'd, 101 F.3d 691 (3d Cir. 1996) [creation of a grievance system by a state does not create any federal constitutional rights, as prisoners are not constitutionally entitled to a grievance procedure]; Moore v. Sergent, No. 01-1271, 2001 WL 1355298 (6th Cir. Oct. 26, 2001); cf. Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir. 1989) [prison officials may place reasonable limits on prisoner's access to grievance procedure].

Therefore, while Plaintiff may have some administrative and/or other policy type claim with respect to his grievance complaints, he has failed to set forth a cognizable claim under § 1983 with regard to this cause of action, and it should be dismissed.

## Conclusion

Based on the foregoing, it is recommended that the Defendants' motion for summary judgment be **granted**, and that this case be **dismissed**.

The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

Columbia, South Carolina

November 14, 2006

20



**Notice of Right to File Objections to Magistrate Judge's Report and Recommendation
&
The Serious Consequences of a Failure to Do So**

The parties are hereby notified that any objections to the attached Report and Recommendation (or Order and Recommendation) must be filed within **ten (10) days** of the date of its filing. 28 U.S.C. § 636 and Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three days for filing by mail. Fed. R. Civ. P. 6. Based thereon, this Report and Recommendation, any objections thereto, and the case file will be **delivered to a United States District Judge** fourteen (14) days after this Report and Recommendation is filed. Advance Coating Technology, Inc. v. LEP Chemical, Ltd., 142 F.R.D. 91, 94 & n. 3 (S.D.N.Y. 1992). A magistrate makes only a recommendation, and the authority to make a final determination in this case rests with the United States District Judge. See Mathews v. Weber, 423 U.S. 261, 270-271 (1976); and Estrada v. Witkowski, 816 F. Supp. 408, 410 (D.S.C. 1993).

During the ten-day period, but not thereafter, a party must file with the Clerk of Court specific, written objections to the Report and Recommendation, if he wishes the United States District Judge to consider any objections. **Any written objections must _specifically identify_ the portions of the Report and Recommendation to which objections are made _and_ the basis for such objections.** Failure to file written objections shall constitute a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the United States District Judge. See United States v. Schronce, 727 F.2d 91, 94 & n. 4 (4th Cir.), cert. denied, Schronce v. United States, 467 U.S. 1208 (1984); and Wright v. Collins, 766 F.2d 841, 845-47 & nn. 1-3 (4th Cir. 1985). Moreover, if a party files specific objections to a portion of a magistrate judge's Report and Recommendation, but does not file specific objections to other portions of the Report and Recommendation, that party waives appellate review of the portions of the magistrate judge's Report and Recommendation to which he did not object. In other words, a party's failure to object to one issue in a magistrate judge's Report and Recommendation precludes that party from subsequently raising that issue on appeal, even if objections are filed on other issues. Howard v. Secretary of HHS, 932 F.2d 505, 508-509 (6th Cir. 1991). See also Praylow v. Martin, 761 F.2d 179, 180 n. 1 (4th Cir.)(party precluded from raising on appeal factual issue to which it did not object in the district court), cert. denied, 474 U.S. 1009 (1985). In Howard, supra, the Court stated that general, non-specific objections are not sufficient:

> A general objection to the entirety of the [magistrate judge's] report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the [magistrate judge] useless. * * * This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act. * * * We would hardly countenance an appellant's brief simply objecting to the district court's determination without explaining the source of the error.

_Accord_ Lockert v. Faulkner, 843 F.2d 1015, 1017-19 (7th Cir. 1988), where the Court held that the appellant, who proceeded _pro se_ in the district court, was barred from raising issues on appeal that he did not specifically raise in his objections to the district court:

> Just as a complaint stating only 'I complain' states no claim, an objection stating only 'I object' preserves no issue for review. * * * A district judge should not have to guess what arguments an objecting party depends on when reviewing a [magistrate judge's] report.

See also Branch v. Martin, 886 F.2d 1043, 1046 (8th Cir. 1989)("no de novo review if objections are untimely or general"), which involved a pro se litigant; and Goney v. Clark, 749 F.2d 5, 7 n. 1 (3rd Cir. 1984)("plaintiff's objections lacked the specificity to trigger de novo review"). This notice, hereby, apprises the parties of the consequences of a failure to file specific, written objections. See Wright, supra,; and Small v. Secretary of HHS, 892 F.2d 15, 16 (2nd Cir. 1989). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing addressed as follows:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

21

